GAVRIEL GREEN®
℅ 332 NE 24th Ave.
Portland, OR 97232
Pro Se

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| GAVRIEL GREEN® | Civil Case No.: 3:24-cv-01509-SB |
| Plaintiff | |
| v. | |
| VOLCANO HARLEY-DAVIDSON; | COMPLAINT |
| HARLEY-DAVIDSON FINANCIAL SERVICES, INC. AKA EAGLEMARK AKA EAGLEMARK SAVINGS BANK AKA HARLEY-DAVIDSON CREDIT CORP. AKA H-D CREDIT | DEMAND FOR JURY TRIAL |
| Defendants | |

COMES NOW, person GAVRIEL GREEN®, Plaintiff, by and through Gavriel Green, Pro

Se, alleges and states as follows:

## I.    **INTRODUCTION**

The Plaintiff brings forth this action before the Honorable Court seeking actual, statutory,

and punitive damages against Defendants VOLCANO HARLEY-DAVIDSON ("VHD") and

HARLEY-DAVIDSON FINANCIAL SERVICES, INC. AKA EAGLEMARK AKA

EAGLEMARK SAVINGS BANK AKA HARLEY-DAVIDSON CREDIT CORP. AKA H-D

Complaint - Amended                              1

CREDIT (hereafter collectively "The Bank"). VHD and The Bank hereafter referred to collectively as "Defendants".

The grounds for this action arise from two applications for a motorcycle loan and one contract/promissory note. Defendants engaged in breach of contract, conversion, coercion, securities theft, fraud, and a breach of good faith and fair dealing.

## II.      JURISDICTION AND VENUE

This court has jurisdiction over this action and all counts under 28 U.S.C. § 1331.

Venue in this district is proper under 28 U.S.C. § 1391 because the events giving rise to this claim originated in this district.

Joinder in this district is proper as to both Defendants Under Rule 20(a) of the Federal Rules of Civil Procedure as (1) the claims against the Defendants arise out of the same transaction, occurrence, or series of transactions or occurrences, and (2) there is a question of law or facts common to all Defendants.

## III.      PARTIES

*Plaintiff*:

GAVRIEL GREEN® was in STATE OF OREGON at all times material to this suit.

*Defendant*:

VOLCANO HARLEY-DAVIDSON is a For-Profit corporation with its principal place of business located at 3205 Eagle Crest DR NE, Suite 105, Grand Rapids, MI 49525. It is registered with, and conducts business in, the State of Oregon. VHD may be served with process upon TMCR, Inc., at the same address.

*Defendant*:

HARLEY-DAVIDSON FINANCIAL SERVICES, INC. is a Delaware Foreign For-Profit

Corporation with its principal place of business at 222 W Adams St, Suite 3100, Chicago, IL 60606. It conducts business in the State of Oregon. HDFS may be served with process upon CT Corporation System, its registered agent for service of process, at 208 S LaSalle St, Suite 814, Chicago, IL 60604-1101.

## IV.    GENERAL FACTUAL ALLEGATIONS

### A.  Plaintiff's first motorcycle loan application rejected

1. On Friday, June 2, 2023 Plaintiff applied for a motorcycle loan through ESB, a subsidiary of HDFS (AKA "H-D Credit"), at the VHD dealership in Oregon.

2. Plaintiff completed the application with a special indorsement.

3. VHD stated that The Bank's underwriter rejected Plaintiff's indorsement but failed to provide a clear explanation for the rejection.

### B. Plaintiff's second motorcycle loan application

4. Plaintiff returned to VHD's dealership the following day, Saturday, June 3, 2023 and completed a new application for the same motorcycle.

5. Plaintiff autographed the application as:

   "without prejudice,

   gavriel:green, beneficiary"

6. Assistant Sales Manager Karl W. told Plaintiff that The Bank will not accept the application because of the phrase "without prejudice".

7. The Bank did not provide any legal justification for requiring Plaintiff to waive his rights.

8. Plaintiff made it very clear that he would not apply without that phrase.

9. Karl returned a few minutes later, stating the loan was approved.

10. After negotiating the financing terms, Karl informed Plaintiff the motorcycle was not

available for sale and encouraged him to choose another bike from the same lineup.

### C. The contract, confirmation of sale

11. Plaintiff sat across the desk from Business Manager Mike Brown as Mike called The Bank to request permission for Plaintiff to use a paper contract.

12. Plaintiff heard Mike tell The Bank, "That's not a problem—we're going to keep his bike in the shop over the weekend to do a tin swap anyway."

13. When Mike got off the phone, he informed Plaintiff that The Bank approved the request to use a paper contract on the condition that VHD hold Plaintiff's motorcycle until The Bank received the contract in the mail on Monday, June 5, 2023, assuring Plaintiff that he would overnight it.

14. Then Mike and Plaintiff co-signed the Bill of Sale (Exhibit 1) and Mike directed Plaintiff to sign the Contract/Promissory Note (Exhibit 2).

15. Mike provided Plaintiff with a copy of the Bill of Sale, Contract/Promissory Note, the receipt for the down payment/modifications (Exhibit 3), DMV permit and receipt (Exhibit 4), and other sales documents (Exhibit 5).

16. Saleswoman Vicki Hoffarth brought Plaintiff outside VHD for the final part of the sale, "the delivery", where she took pictures of Plaintiff on the bike as proof that VHD had transferred ownership of the bike to Plaintiff. (Exhibit 6).

17. The following day, June 4th, Plaintiff offered General Sales Manager Travis Milward the option to exchange his new motorcycle for a used one that already had all the modifications Plaintiff and VHD had agreed upon. However, Travis explained that while this could have been done the previous day, it was now too late since everything, including registration, was already in Plaintiff's name.

18. On June 5th, Travis called Plaintiff, confirming he is welcome to take the bike.

19. During Plaintiff's visit to the dealership the following day, June 6th, Business Manager Joe V. quietly told Plaintiff, "We spoke to the bank. The bike will be paid off in one week, they'll remove the lien, and the bike is yours."

20. Vicki then joined the conversation, and she and Joe discussed the anticipated timeframe for The Bank to release the lien and for Plaintiff to receive the title.

**D. The breach of contract**

21. On Friday, June 9th, Business Manager Mike Brown informed Plaintiff that The Bank is refusing to pay VHD unless Plaintiff either autographs a new contract or provides a basis for his use of "without prejudice".

22. Plaintiff assisted Mike in finding UCC § 1-308, which is codified in ORS 71.3080.

23. Although Mike expressed concern that The Bank might still refuse to pay VHD, he did not suggest or imply Plaintiff would have to return his bike in that case.

24. On or about June 11th, Vicki accompanied Plaintiff to check on the status of his parts.

25. Jerry in the Parts department informed Plaintiff and Vicki that he had to wait for the financing to go through before ordering the parts and stated that, since his system showed the financing went through four days earlier, he had already placed the order.

26. Vicki commented to Plaintiff, "I told you it was a done deal."

27. On June 15th, Plaintiff happened to run into Mike on the sales floor and asked Mike how things went with The Bank.

28. Mike complained that even though he sent The Bank the legal source for Plaintiff's use of "without prejudice", The Bank still refused to pay VHD.

29. Mike commented that he couldn't even register Plaintiff's motorcycle because of The

Bank's lack of cooperation.

30. Mike tried to register Plaintiff's motorcycle because he had sold it to Plaintiff.

31. During Mike and Plaintiff's conversation, Mike discovered that Plaintiff's motorcycle was waiting for parts at VHD's service department.

32. Upon learning this, Mike abruptly shifted the conversation from trying to get Plaintiff to sign a new contract (i.e., waive his rights) to a stark "You can't have the bike."

33. Mike refused Plaintiff's request to put that in writing, stating Travis would do it.

34. Travis was out that day, and has not responded to Plaintiff's email request.

35. On or about the same day, Plaintiff received a Welcome letter from Bill Davidson, along with his Harley Owners Group (HOG) Membership card.

36. On June 27, 2023 at 10:43 a.m. Plaintiff received the following text message:

"Hi Gaverial, Shad @ VHD. Your bike should be done by the end of the day today or first thing tomorrow."

37. On June 29th, after not receiving any updates and making several attempts to reach a VHD employee willing to explain, Plaintiff finally got a hold of Service Department Manager Charlie.

38. Charlie told Plaintiff that Mike had instructed them the day before to hold off working on Plaintiff's motorcycle because "the financing hasn't gone through and there is no sale."

**E. Plaintiff seeks justice against Defendants**

39. Plaintiff mailed three sets of instructional letters to Susan Paskvan, The Bank's CFO, accepting all titles, rights, interest and equity owed to GAVRIEL GREEN®, and instructing Susan to fulfill her fiduciary duties.

40. On July 7, 2023, Plaintiff filed a Complaint against VHD with the Oregon DOJ.

**F. Plaintiff informs VHD of lien**

41. On July 11, 2023, Plaintiff discovered VHD had refunded the down payment.

42. On July 11th, Plaintiff emailed Joe, Travis, and Mike at VHD to inform them that Plaintiff had filed a lien on his motorcycle, as well as having submitted a Complaint with the Oregon DOJ.

43. On July 24th and 25th, Plaintiff reported The Bank to the CFPB, SEC, and FTC for breach of contract.

**G. The Bank evades Plaintiff's inquiries about the contract**

44. On or about August 8th, Plaintiff received a letter from The Bank (signed by ESB) dated August 2nd, in response to his complaint with the CFPB, stating they received Plaintiff's credit application from June 2nd but closed the account because they had not received a signed contract. (Exhibit 7).

45. The Bank did not address Plaintiff's application or contract signed June 3, 2023—the sole subject of his complaint.

46. On August 11, 2023, Plaintiff reported The Bank to the FDIC.

47. On or about September 6th, the FDIC responded, Ref. No. 01619262:

    "Regulation B, which implements the Equal Credit Opportunity Act (ECOA), requires creditors to notify an applicant of approval, counteroffer, or adverse action taken within 30 days after receiving a completed application.

    It is outside of the FDIC's regulatory authority to resolve disputes over the interpretation of a contract. You may wish to consult with an attorney if you choose to pursue the issue." (Exhibit 8).

**H. VHD ignores Plaintiff's negative reviews**

48. On August 21, 2023, Plaintiff left a review on Google, Yelp, and the Volcano
    Harley-Davidson Facebook page, sharing his poor customer experience, the photo of him
    taking possession of his motorcycle, and notifying potential customers of his lien.

49. VHD has not acknowledged Plaintiff's reviews, either publicly or privately.

   **I. Plaintiff's affidavits and NOI to sue Defendants**

50.  On August 22nd, Plaintiff emailed General Manager Ron at VHD, offering him five days
    to address each point on Plaintiff's Complaint with the Oregon DOJ.

51. On October 20, 2023, Plaintiff sent Ron at VHD an affidavit via Registered Mail # RF
    668 524 299 US.

52. Plaintiff extended Ron 30 calendar days to respond to each and every point.

53. VHD signed for this affidavit on October 21, 2023 at 10:45am.

54. Ron did not respond to Plaintiff's affidavit.

55. On Saturday, November 25, 2023 Plaintiff hand delivered Ron a Notice of Intent to Sue,
    offering him ten calendar days to settle.

56. VHD did not respond.

57. On March 4, 2024, Plaintiff mailed Susan Paskvan, The Bank's CFO, an affidavit via
    Registered Mail # RF 668 524 285 US.

58. Plaintiff's affidavit extended The Bank fourteen days to respond to each and every point
    under penalty of perjury—stating that silence is acquiescence.

59. The Bank signed for this affidavit on March 18, 2024.

60. The Bank did not respond to Plaintiff's affidavit.

61. On April 8, 2024, Plaintiff mailed The Bank's legal department a copy of the unrebutted
    affidavit along with a Notice of Intent to Sue via Priority Mail # EI 318 403 136 US.

62. Plaintiff extended The Bank twenty-one days from receipt to settle.

63. The Bank signed for Plaintiff's NOI to Sue on April 10, 2024.

64. The Bank did not respond to Plaintiff's NOI.

### J. VHD resold Plaintiff's bike

65. VHD resold Plaintiff's bike to another customer without Plaintiff's consent.

66. On Sunday, June 16, 2024 at 10:27 a.m., Vicki at VHD texted Plaintiff, "Hey my Organizer just popped up to wish you happy 1 year anniversary of owning your bike." [In good humor, acknowledging the irony of the situation.]

### V.    COUNT ONE - BREACH OF CONTRACT

67. Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

### A. VHD's Breach

68. On Saturday, June 3, 2023, VHD sold Plaintiff a motorcycle, as evidenced by the Bill of Sale, down payment receipt, photo of Plaintiff taking possession of the bike, along with confirmation by several VHD employees from various departments.

69. VHD initially held Plaintiff's motorcycle as collateral until The Bank received the contract/promissory note in the mail.

70. After satisfying that condition, Plaintiff entrusted the dealership with his motorcycle for the express purpose of completing the paid-for modifications.

71. VHD's agreement was to hold Plaintiff's motorcycle for service-related purposes, not as collateral for any other reason.

72. On June 6th, Joe informed Plaintiff that his motorcycle would be paid off in about another week and that he would receive the title, thereby forming an oral agreement.

73. Oral agreements are legally enforceable, just like written contracts.

74. VHD retroactively denied selling Plaintiff a motorcycle, and refused to work on it or release it.

75. Mike and Joe fulfill the same role at VHD (finance guys) and spoke to the same bank regarding the same motorcycle and contract/promissory note.

76. Joe had informed Plaintiff the motorcycle would be paid for in one week and Plaintiff would hold title—while Mike denies having ever sold Plaintiff the bike to begin with.

77. Joe ignored Plaintiff's numerous efforts to clarify the discrepancy and failed to provide any valid justification for what would otherwise constitute a breach of contract.

78. Plaintiff is not aware of any 'spot delivery' or 'yo-yo financing' provision in the contract that would allow VHD to reclaim the motorcycle if they failed to secure financing.

79. If such a provision exists, VHD had a duty to disclose it at the time of sale.

80. If such a provision exists, Plaintiff provided ample opportunity for VHD to cite it, thereby justifying what would otherwise be a clear breach of contract.

81. Although Plaintiff was empathetic toward VHD's situation—going so far as to instruct The Bank to pay VHD and reporting The Bank for breach of contract—ultimately, the issues between VHD and The Bank are not Plaintiff's responsibility.

82. Plaintiff was deprived of his property due to VHD's breach of contract.

**B. The Bank's Breach**

83. The Bank conducts business in Oregon, and the contract states that it is deemed to have been executed in Carson City, Nevada.

84. On Saturday, June 3, 2023, The Bank pulled Plaintiff's credit.

85. The Bank agreed to purchase Plaintiff's contract/promissory note from VHD, as indicated

on page 1 of the contract/promissory note.

86. The credit application and the promissory note were distinct transactions—Plaintiff could have neglected to reserve his rights on the credit application while still reserving them on the promissory note, or vice versa.

87. The Bank's use of "Eaglemark Savings Bank" on the application and promissory note/contract constitutes its signature, as defined under UCC § 3-401, codified under ORS 73.0401 and NRS 104.3401.

88. Plaintiff's use of "without prejudice, gavriel: green, beneficiary" constitutes a signature, as defined under UCC § 3-401, codified under ORS 73.0401 and NRS 104.3401.

89. VHD agreed to hold Plaintiff's motorcycle over the weekend until The Bank received Plaintiff's paper contract in the mail on Monday, June 5th.

90. Plaintiff provided personal information, authorized The Bank to pull the credit, signed all required documents, paid the down payment, submitted proof of insurance for the new motorcycle, provided STATE OF OREGON ID, and left the motorcycle with VHD, thereby fulfilling his obligations under both the oral and written contract.

91. VHD scanned and mailed Plaintiff's contract, as agreed, and held Plaintiff's motorcycle until the agreed upon date.

92. The Bank refused to fulfill their agreement to pay VHD.

93. The Bank demanded VHD provide the basis for Plaintiff's use of "without prejudice."

94. The burden of proof for challenging Plaintiff's reservation of rights lies with The Bank, not with Plaintiff to justify his reservation.

95. Plaintiff was entitled to reserve his rights, as permitted by law.

96. Plaintiff did not request any rights beyond those to which he was already entitled by law.

97. Although VHD fulfilled The Bank's demand to provide the basis for "without prejudice", The Bank still refused to pay as agreed.

98. The Bank failed to provide any legal justification for rejecting Plaintiff's reservation of rights on the credit application.

99. The Bank's preference to violate Plaintiff's rights is not a legally valid reason for refusing to extend credit.

100.    The Bank's rejection of Plaintiff's reservation of rights on the credit application constitutes discrimination, as this was the sole basis for initially refusing to extend credit.

101.    The Bank failed to provide any rationale for requiring Plaintiff to waive his rights on the contract/promissory note.

102.    The Bank's desire to violate Plaintiff's rights is not a legally valid reason for withholding payment, irrespective of its assumption Plaintiff waived those rights on the application.

103.    The Bank has no right of recourse to withhold the financing on the grounds that they were misled into believing Plaintiff waived his rights, as rejecting Plaintiff's application based on the reservation of rights was never legally justified.

104.    If The Bank were justified in refusing to finance the motorcycle based on Plaintiff's reservation of rights, Plaintiff has provided ample opportunities for The Bank to cite such justification, which would otherwise constitute a clear breach of contract.

105.    The FDIC recognizes this dispute as a contractual matter. (Exhibit 8).

106.    Plaintiff endured significant stress as a result of The Bank's breach of contract.

107.    Defendants' breach of contract, both individually and collectively, caused significant aggravation, stress, and disappointment, as Plaintiff invested considerable time and effort

in fighting for his rights and property.

## VI. COUNT TWO - CONVERSION

108.    Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

109.    Plaintiff entrusted VHD with his motorcycle to perform some modifications.

110.    VHD's service department acknowledged Plaintiff's ownership of the motorcycle at the time of the sale, along with ongoing communications.

111.    Despite this, VHD refused to return the motorcycle upon Plaintiff's request.

112.    VHD deprived Plaintiff of the use of his motorcycle.

113.    VHD sold Plaintiff's motorcycle again to another customer.

114.    Plaintiff invested an inordinate amount of time and energy into the initial purchase and subsequent efforts to retrieve his motorcycle from VHD, consuming his life as detailed throughout this pleading.

115.    Plaintiff not only lost his first-ever motorcycle and several months of Oregon's short riding season, but also his long-held admiration for Harley-Davidson.

## VII. COUNT THREE - FRAUD

116.    Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

117.    Karl told Plaintiff The Bank would not accept his loan application from June 3rd because of Plaintiff's inclusion of "without prejudice" above his autograph.

118.    Plaintiff made it very clear he would not apply for credit without that phrase.

119.    Karl knowingly omitted "without prejudice" from Plaintiff's loan application.

120.    Karl induced Plaintiff into proceeding with the sale by leading him to believe The

Bank had accepted his reservation of rights on the application.

121. Karl's deception became evident when The Bank subsequently rejected Plaintiff's contract because it included "without prejudice".

122. This resulted in Plaintiff being deprived of his new Harley-Davidson, the waste of time and energy invested in the sale, a hard inquiry on his credit report, and the significant stress, heartache, and aggravation caused by a transaction that Plaintiff would not have entered into had full disclosure been made.

## VIII. COUNT FOUR - VIOLATION of ORS 71.3080/NRS 104.1308 and COERCION

123. Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

124. VHD conducts business in Oregon and is subject to the Oregon Revised Statutes.

125. Plaintiff invoked ORS 71.3080/NRS 104.1308 ("without prejudice") above each autograph on every document VHD provided, including but not limited to the credit application and Contract submitted to The Bank and VHD's Bill of Sale.

126. The Bank has not cited any legal basis for dishonoring Plaintiff's credit application or any authority permitting it to require Plaintiff to waive his rights.

127. The Bank has not cited any legal basis for dishonoring Plaintiff's contract or any authority permitting it to require Plaintiff to waive his rights.

128. Plaintiff's use of "without prejudice" does not negate the validity of Plaintiff's signature, as defined under UCC § 3-401, ORS 73.0401, or NRS 104.3401.

129. The Bank coerced VHD to produce a new contract omitting Plaintiff's reservation of rights by withholding payment in the interim.

130. VHD extorted Plaintiff into waiving all the rights he had expressly reserved with The

Bank, even though Mike approved each and every one of Plaintiff's reservation of rights

prior to completing the sale and mailing in the contract/promissory note.

131.    VHD has not cited any legal basis for dishonoring the Bill of Sale, wherein Plaintiff

had expressly reserved his rights.

132.    Coercing Plaintiff into waiving his rights in exchange for a motorcycle constitutes a

form of abuse. The damage goes beyond the mere loss of the motorcycle and the time and

energy invested; it represents a significant attack on Plaintiff's dignity, resulting in an

acute awareness of being exploited and dehumanized.

## IX. COUNT FIVE - ENFORCEMENT OF LOST INSTRUMENT

### (ORS 73.0309 and/or NRS 104.3309)

133.    Plaintiff realleges and restates the foregoing jurisdictional allegations and general

factual allegations.

134.    Plaintiff executed a promissory note.

135.    A promissory note is a negotiable instrument under UCC § 3-104, codified under

ORS 73.0104 or NRS 104.3104, depending on the applicable jurisdiction.

136.    Plaintiff tendered the negotiable instrument to VHD.

137.    VHD tendered Plaintiff's negotiable instrument to The Bank.

138.    On August 2, 2023, The Bank implied that it did not receive the contract, which

includes the promissory note/negotiable instrument.

139.    Plaintiff is entitled to enforce the "lost" instrument under ORS 73.0309 and/or NRS

104.3309.

140.    In plain English, even if The Bank truly did not receive Plaintiff's promissory note,

that is not a legally valid excuse for refusal to pay VHD.

141.   The Bank must pay for the motorcycle to perform on the instrument.

142.   The Bank refuses to perform on the "lost" instrument.

143.   The Bank's refusal to perform caused Plaintiff to be deprived of the motorcycle that
was explicitly guaranteed in exchange for the note.

## X. COUNT SIX - SECURITIES THEFT

144.   Plaintiff realleges and restates the foregoing jurisdictional allegations and general
factual allegations.

145.   On June 3, 2023, Plaintiff indorsed a Promissory Note for VHD to sell to The Bank.

146.   "PROMISSORY notes are almost invariably described in judicial opinions and in
legal texts as being either substitutes for money… contracts circulating like money and
performing in part the functions of money… credit instruments performing the functions
of paper money… and serving as a substitute for government bills or notes." *Minnesota
Law Review*, *The Promissory Note as a Substitute for Money*, Vol. 16, 1930. (Exhibit 9).

147.   Plaintiff's Promissory Note constitutes an unconditional promise to pay $32,119.20,
which includes $21,083.01 as the amount financed (comprising the Selling Price and
fees), along with a $11,036.19 finance charge. (Exhibit 2).

148.   Plaintiff's unconditional promise to pay satisfies the criteria for a negotiable
instrument under UCC § 3-104, codified under ORS 73.0104 and NRS 104.3104.

149.   "A negotiable instrument is an asset that has a guaranteed cash value. The owner may
swap it for goods, deposit it, or sell it."  Investopedia, *What Is Negotiable?*

https://www.investopedia.com/terms/n/negotiable.asp

150.   Upon rejecting Plaintiff's security, The Bank had a duty to return it to Plaintiff.

151.   The Bank has not returned Plaintiff's valuable security.

152.    Under Rule 301 of the Federal Rules of Evidence, The Bank has the burden of rebutting the presumption it monetized Plaintiff's promissory note because promissory notes are routinely securitized or sold.

153.    By failing to rebut any points in Plaintiff's affidavit, The Bank has acquiesced to monetizing the note.

154.    The Bank owes Plaintiff consideration equivalent to the full value of his security.

155.    In addition to this amount, Plaintiff is entitled to an award for punitive damages.

## XI. COUNT SEVEN - UNJUST DISHONOR OF NEGOTIABLE INSTRUMENT

156.    Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

157.    On June 3, 2023, Plaintiff autographed a promissory note—an unconditional promise to pay—meeting the criteria for a negotiable instrument under UCC § 3-104, as codified in ORS 73.0104 and NRS 104.3104, depending on jurisdiction.

158.    Plaintiff tendered the negotiable instrument to VHD.

159.    VHD tendered the instrument to The Bank by scanning it.

160.    VHD tendered the original to The Bank through the mail.

161.    Upon tendering a negotiable instrument it is considered delivered.

162.    Delivery of a negotiable instrument constitutes acceptance.

163.    Upon acceptance, one must either (a) honor a negotiable instrument or (b) dishonor the instrument in accordance with UCC § 3-502, as codified under ORS 73.0502 or NRS 104.3502.

164.    The Bank's rejection of the instrument does not align with any of the valid grounds for dishonor outlined in ORS 73.0502 and NRS 104.3502.

165.    Plaintiff lost his motorcycle as a result of The Bank's unjust dishonor.

## XII. COUNT EIGHT - DECEPTIVE PRICING PRACTICES

166.    Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

167.    While reviewing the finance and loan terms, Plaintiff asked Karl at VHD about financing additional things, such as riding gear and insurance.

168.    Karl informed Plaintiff that financing was only approved for the motorcycle itself and that inflating the motorcycle's selling price to include additional items was not feasible because the bank would verify the MSRP and detect any discrepancies.

169.    Plaintiff relied on Karl's statement that VHD was charging the MSRP.

170.    Plaintiff did not learn the true MSRP until December 2023 while researching the official Harley-Davidson website in preparation for this Complaint.

171.    Plaintiff's 2023 black* Nightster base model had an MSRP of $13,499.00, as listed on the official Harley-Davidson website at the time. [*The model in stock had a red tin, which VHD promised to swap for a black one.]

172.    Travis offered to "pay for" mini ape handlebars and forward controls.

173.    After crunching the numbers, Travis concluded he "would pay for most of it," and Plaintiff would pay "the remaining $500" out of pocket.

174.    In light of Karl's earlier assertion that the selling price must reflect the MSRP, the Bill of Sale should accurately reflect a Selling Price of $13,499.

175.    Plaintiff's Bill of Sale shows a $17,316 Selling Price.

176.    VHD overcharged Plaintiff by $3,817 above MSRP for a black base model.

177.    While preparing this Complaint, Plaintiff discovered the "66 Package" option, which

included the modifications Travis had offered, with an MSRP of $15,880.46 at the time.

178.    VHD charged Plaintiff $1,435.54 more than it would have cost to purchase a 2023

black Nightster with the same features that Travis offered.

179.    This discrepancy indicates Travis did not "pay for" the modifications—they were

simply rolled into the Selling Price.

180.    This significant discrepancy between the Selling Price and the MSRP invalidates

Karl's denial of Plaintiff's ability to finance riding gear, as well as Mike's denial of

Plaintiff's ability to finance a 3-Year VIP Plan.

181.     Given the ample financing available to cover the entire cost of parts and labor, there

was no justification for charging Plaintiff's credit card an additional $500 for "his

portion" of the modifications.

182.    VHD swindled Plaintiff.

183.    Plaintiff's damages include the emotional and psychological impact of being misled

and nearly defrauded, particularly by a brand as revered as Harley-Davidson.

## XIII. COUNT NINE - LACK OF FULL DISCLOSURE, BREACH OF GOOD FAITH

184.    Plaintiff realleges and restates the foregoing jurisdictional allegations and general

factual allegations.

185.    VHD did not disclose that the motorcycle was not for sale until Plaintiff had already

applied for it twice (on June 2nd and June 3rd) and negotiated the terms.

186.    VHD waited until Plaintiff was already on his way to the back office to sign the

contract before disclosing that the motorcycle required daily charging—a significant and

unusual requirement which a customer would not typically think to inquire about.

187.    This significantly diminished Plaintiff's perception of the bike's value, and Plaintiff

felt exploited when he learned the charger was sold separately.

188.    Mike deliberately removed certain pages from Plaintiff's sales packet, dismissing

them as "just some legalese."

189.    About eleven days later, when Plaintiff requested copies of the omitted documents,

Mike denied the request and referred Plaintiff to Travis, who ignored Plaintiff.

190.    Karl denied Plaintiff the right to finance the obligatory motorcycle insurance,

claiming it wouldn't be practical to coordinate between The Bank and insurance provider.

191.    However, after Plaintiff completed all the paperwork at Mike's office, Vicki handed

him a *Harley-Davidson Insurance* flier—rendering Karl's explanation dubious.

192.    While reviewing the contract in preparation for this Complaint, Plaintiff discovered

that it explicitly offered the option to include insurance in the financing.

193.    Mike bullied Plaintiff into signing an agreement to purchase his own insurance.

194.    Plaintiff included the phrase "under duress" alongside his autograph.

195.    Moments later, Mike instructed Plaintiff to decline the optional insurance offered in

the contract, referencing Plaintiff's "agreement" to provide his own coverage.

196.    Plaintiff later realized that the insurance he had declined cost $0.

197.    On June 29, 2023, when Charlie informed Plaintiff of Mike's denial of the sale, he

spoke harshly and in an admonishing tone, as if Plaintiff should have known better than

to inquire about the bike he had clearly purchased—instead of showing empathy for what

could have been seen as an unfortunate misunderstanding.

198.    Mike, Travis and Joe stood on the sidelines as Plaintiff fought for VHD's rights with

The Bank, without so much as a "thank you" or the common decency to let Plaintiff

know VHD refunded the $500 down payment/service department payment.

199.    When Plaintiff later discovered the refund and realized he had been fighting for VHD in vain, he felt abandoned—like a soldier left on the battlefield, unaware that the war had already ended.

200.    VHD has not even so much as acknowledged Plaintiff's negative reviews in which he shared his horrific experience.

201.    When Plaintiff hand-delivered his NOI to sue on November 25, 2023, VHD's receptionist shoved it back at him and gave him a guilt trip for asking her to sign for it.

202.    Shortly thereafter, when Plaintiff handed it to Ron, he too slid it back across the desk like a hot potato, stating he has no idea what this is about, and denied receiving Plaintiff's affidavit sent Registered Mail.

203.    Plaintiff, already exasperated by months of VHD's evasion, blurted out, "Your service department stole my bike."

204.    Ron shrugged and casually replied "We asked Harley-Davidson, and they said what we're doing is ok."

205.    Later in the conversation, Ron repeated the same statement with the same nonchalance, suggesting he had no real understanding or basis for the claim that VHD's actions were "ok."

206.    When Plaintiff brought up the Bill of Sale, Ron smiled and showed Plaintiff out the door.

207.    Seeing Plaintiff's determination to sue VHD, Ron's parting words were, "Well, no matter what, I'll still consider you a Harley Rider."

208.    Even if VHD had the right to rescind the sale, their treatment toward Plaintiff was inexcusable—this persistent disregard for Plaintiff's rights and lack of respect and dignity

toward him constitutes an egregious breach of the duty of good faith and fair dealing.

209.    VHD's refusal to return Plaintiff's motorcycle is part of their broader pattern of misconduct and should be evaluated as such.

210.    This unacceptable mistreatment, coupled with The Bank's equally dismissive and evasive responses, has taken a severe toll on Plaintiff's well-being, leading to insomnia, heart palpitations, difficulty concentrating, obsessive thoughts, emotional eating, disrupted workout routines, weight gain, accelerated hair loss, and interference with Plaintiff's hypnotherapy.

211.    In the year that followed, Plaintiff felt recurring anxiety when leaving his property with a mechanic overnight, escalating to panic during a month-long stay.

## XIV.    DEMANDS FOR RELIEF

212.    VHD has tacitly agreed for Plaintiff to sue for Ten Million US Dollars ($10,000,000.00).

213.    The Bank has tacitly agreed to the following damages:

A. Payment of One Hundred Million US Dollars ($100,000,000.00) by check.

B. Plaintiff will autograph an instrument for One Billion US Dollars ($1,000,000,000.00), which The Bank shall monetize and transfer the full proceeds to Plaintiff. Defendant may deduct a reasonable fee for this service.

214.    Any other relief this Honorable Court deems just and proper under the circumstances.

Dated February 12, 2025                    RESPECTFULLY SUBMITTED,

                                           GAVRIEL GREEN®

                                           By: /s/ Gavriel Green