GAVRIEL GREEN®
11918 SE Division St. #2189
Portland, Oregon 97266
court.unbraided301@passinbox.com
512.277.3920

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| GAVRIEL GREEN® | Case No. 3:24-cv-01509-SB |
| Plaintiff, | PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT |
| v. | |
| VOLCANO HARLEY-DAVIDSON | |
| Defendant. | |

COMES NOW person GAVRIEL GREEN®, Plaintiff, by and through Gavriel, pro se, in

OPPOSITION to *Defendant's Motion to Dismiss Plaintiff's First Amended Complaint*, and addresses

each of Defendant's statements, point-by-point in the order of which they appear in Defendant's

"Memorandum of Points of Authorities":

### "MEMORANDUM AND POINTS OF AUTHORITIES"

**"I.     INTRODUCTION"**

Defendant states: "Green acknowledges that his finance application was rejected and that, as a

result of his failure to secure financing, VHD did not ultimately sell him a motorcycle." However, this

statement is inconsistent with the factual allegations Plaintiff included in the FAC–

Page 1 – PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

(a) Plaintiff acknowledges that VHD initially told Plaintiff The Bank wouldn't accept Plaintiff's credit application; however, as alleged in FAC ¶ 9: "Karl returned a few minutes later, stating the loan was approved."

(b) Plaintiff does not acknowledge that he "fail[ed] to secure financing." Plaintiff acknowledges that credit was approved, it was not a spot delivery[1] situation, all conditions had been met, The Bank agreed to pay VHD, The Bank later refused to honor that agreement (FAC Count One B), and that "the issues between VHD and The Bank are not Plaintiff's responsibility." (FAC ¶ 81.)

(c) Plaintiff does not acknowledge that "VHD did not ultimately sell him a motorcycle."[2] Plaintiff's acknowledgement that VHD *claims* "there was no sale" is not acknowledgement of the validity of that claim.

Defendant's Memorandum continues, "Green also admits that VHD returned his $500 down payment and he does not identify any damages he sustained as a result of his unsuccessful attempt to buy a motorcycle from VHD." This statement is mostly incorrect–

(a) Plaintiff successfully bought a motorcycle from VHD. Then their service department refused to perform as promised and held Plaintiff's property as leverage, coercing him into waiving his rights in order to resolve VHD's dispute with The Bank. Had Plaintiff not entrusted VHD's service department with his new Harley-Davidson, he would still be riding it to this day.

(b) Plaintiff has identified several damages sustained as a result of Defendant's fraud, breach of contract, conversion, and breach of the implied covenant of good faith and fair dealing.

(c) Regarding the refund, that too was tainted with bad faith (e.g., VHD's lack of common decency to notify Plaintiff).

---

1. *Spot delivery* is an automobile sale where the customer takes possession of the auto "on the spot," before financing is approved. The sale is contingent on whether a financial institution agrees to buy the contract within a specified period.
2. If Plaintiff believed that were true, he would not file claims for breach of contract or conversion in the first place.

Defendant continues: "Instead of plausibly alleging damages, Green claims that 'VHD has tacitly agreed for Plaintiff to sue for Ten Million US Dollars.'" It would be more accurate to state "*In addition to* plausibly alleging damages…" In any event, even if Plaintiff hadn't plausibly alleged damages (which he did), Plaintiff's unrebutted affidavit to VHD stands as truth in commerce and his NOI to Sue stated in no uncertain terms that he would sue VHD for $10M due to their defaulting on his affidavit. VHD's failure to respond to Plaintiff's NOI to Sue is tacit agreement to be sued for $10M. Notably, the Memorandum doesn't mention Plaintiff's good faith $250,000 settlement counter-offer after TMCRC ("VHD") was served.

Defendant's footnote 1 brings up Plaintiff's outdated demands for relief against The Bank and concludes that, "Green's prayer for relief for astronomical sums is illustrative of his failure to include any well-pled allegations as to damages." Plaintiff responds–

(a) Plaintiff's demands for relief against former defendant is irrelevant to the four current claims against VHD, and would be equally irrelevant had The Bank been served.

(b) Not that it's relevant to VHD or this case at all, but Plaintiff's prior demands for relief were based, in part, on Federal Reserve Act Section 16(2) and Section 29(c) Civil Money Penalty Third Tier, and Plaintiff's unrebutted affidavit and conditions in his notice of intent to sue.

(c) VHD fails to demonstrate how those demands illustrate their conclusion that Plaintiff "fail[ed] to include any well-pled allegations as to damages."

(d) Either Plaintiff suffered damages or not–the sum demanded (whether one dollar or one hundred trillion dollars) doesn't negate the underlying allegations as to damages incurred.

(e) Defendant has not demonstrated that this Honorable Court erred in its conclusion that Plaintiff sufficiently pled damages in the current four claims against VHD.

Page 3 states, "Green's breach of contract claim fails because he admits that he did not secure financing and also admits that financing was a condition precedent to any obligation of VHD to sell

him a motorcycle." Defendant appears to suggest that the financing was still pending at the time all the paperwork was signed and submitted. However, the opposite is true: Eaglemark Savings Bank is VHD's exclusive lender. When a VHD customer's credit application is approved, and VHD and the customer negotiate the financing terms, there's no question that ESB/HDFS will offer to contract on those terms. The contract was clearly offered by ESB–not a generic contract created by VHD with intent to sell to a yet to be determined lender. By signing and submitting that contract, the customer accepts ESB/HDFS' offer. That acceptance of offer triggers VHD's obligation to sell that motorcycle and The Bank's obligation to pay VHD as itemized in the contract/promissory note.

Under black-letter contract law, an offer is accepted when the offeree accepts the offerer's offer and mails it out–not when the offeree receives it.[3] Furthermore, the law recognizes mutual assent even when the exact moment of the offer or acceptance cannot be pinpointed.[4] The contract was as binding the moment it was placed in the mailbox as any other VHD customer's digitally signed contract. The parties' agreement that VHD hold Plaintiff's property until Monday, June 5, 2023 doesn't create any special right of rescission not explicitly stated in the contract or on the bill of sale.

Next sentence states, "Relatedly, Green fails to allege that he performed under any alleged sale contract, because he admits that he did not, and could not, pay for the motorcycle." The FAC does not admit to either of those, and even if did, it would be irrelevant, as Plaintiff's payment to VHD (after the down payment) was never a requirement. Plaintiff admits that he paid VHD $500 as agreed and that The Bank agreed to pay VHD the remainder. In the FAC, Plaintiff outlines all that was required of him

_____

3. *Restatement (Second) of Contracts* § 63 (1981) ("Unless the offer provides otherwise, (a) an acceptance made in a manner and by a medium invited by an offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror...")

4. *Restatement (Second) of Contracts* § 22(2) (1981) ("A manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined.")

and alleges that he fulfilled each and every one of his obligations under both the written and oral contract.

Next sentence: "...and since Green admits he did not perform, his breach of contract claim fails." This statement is unsubstantiated; Plaintiff admits he fully performed and that he subsequently went above and beyond.

Next paragraph: "Green's breach of the covenant of good faith and fair dealing claim fails for the same reasons his breach of contract claim fails, because the covenant does not create obligations greater than the contract on which it is based." However, the contract still existed, whether Defendant breached it or not. The *Findings and Recommendation* dated March 12, 2025 (ECF No. 5) footnote 1 (pp. 4 and 5) acknowledges this when it explicitly cites FAC ¶ 208: ("Even if VHD had the right to rescind the sale, their treatment toward Plaintiff was inexcusable—this persistent disregard for Plaintiff's rights and lack of respect and dignity toward him constitutes an egregious breach of the duty of good faith and fair dealing.")

In the paragraph after that, Defendant aims to dismiss the conversion claim by repeating the incorrect implication that the sale in question was a spot delivery, even though–to VHD's credit–VHD doesn't do spot deliveries. Defendant reiterates the false assertion that Plaintiff  "admits that he did not secure financing." Then it cites ORS § 646A.090, a statute which describes a situation wherein a buyer takes possession of a vehicle before the dealer finds a lender to agree to purchase the contract; i.e., a spot delivery. Since VHD doesn't let any customer take a motorcycle without The Bank's prior agreement to finance the purchase, the spot delivery statute does not apply.

Next, Defendant asserts that Plaintiff's "claim for fraud fails as well… he does not clearly identify what the allegedly actionable misrepresentation by VHD was, any acts he took on reliance on any alleged misrepresentation, or how any acts he took on reliance on any misrepresentation by VHD

caused him damages." However, it is unmistakably clear from the FAC that Karl knowingly omitted a material part of Plaintiff's application against Plaintiff's express wishes not to remove it. Plaintiff did not consent to running his credit without that phrase.[5] By processing Plaintiff's credit application and telling Plaintiff that it's all good, the application was approved, Karl misrepresented to Plaintiff that The Bank had accepted the application with Plaintiff's reservation of rights. Karl induced Plaintiff into having his credit run and to proceed with a sale Plaintiff would not have agreed to otherwise.

The final paragraph of Defendant's section I concludes, "no set of facts consistent with what Green has already pled could give rise to a cognizable claim against VHD." A more accurate conclusion would be: *No set of facts consistent with VHD's incorrect, misleading and unsupported representation of Plaintiff's First Amended Complaint could give rise to a cognizable claim against VHD.*

## "II.    BACKGROUND"

### "A.    Procedural History"

Defendant presents a manipulative and incomplete "procedural history." Defendant goes into lengthy detail about this Honorable Court's unfavorable opinions about some of Plaintiff's claims which this Court dismissed prior to service of process (and are therefore irrelevant) regarding former defendant (rendering these claims and details even more irrelevant). Defendant adds more irrelevant and unfavorable details in footnote 3 regarding an unrelated case Plaintiff subsequently filed against completely different defendants. Defendant's insertion of irrelevant, negative-leaning details poisons the well by unnecessarily drawing attention to stigmatizing bygones. Defendant then outlines the four currently relevant claims. Defendant's outline fails to mention any detail about how/why this

---

5. Had Karl been transparent that he would omit "without prejudice," Plaintiff would have shook Karl's hand and walked out the door–as he did the previous day, when VHD told him he needs to find his own lender if he wants to sign with a special indorsement.

Honorable Court reached its conclusion that Plaintiff has a reasonable opportunity to prevail on those claims.

**"B.    Summary of Allegations"**

Defendant recounts Plaintiff's visits to VHD dealership–including the part where The Bank *initially* refuses to even run Plaintiff's credit–but skips right over the part where Plaintiff's application gets approved. (FAC ¶ 9.) This omission of a material allegation–in the midst of an otherwise detailed account about Plaintiff's June 2 and 3, 2023 credit applications–is very misleading, and the effect of this selective omission is evidenced in Defendant's earlier misstatement that Plaintiff "acknowledges that his finance application was rejected."

Defendant's footnote 5 is irrelevant and stigmatizes Plaintiff based on Plaintiff's assumed political views. The implication that summary dismissal is appropriate based on character traits wholly irrelevant to the claims at hand constitutes discrimination. As to Rule 11, the FAC is signed "GAVRIEL GREEN®, By: /s/ *Gavriel Green*".

Defendant's summary, as continued on p. 6, skips past the part where business manager Mike's words and actions until and including June 15th (12 days post-sale) clearly demonstrate the sale was complete–and that Mike abruptly changed his mind mid-conversation upon discovering the location of Plaintiff's motorcycle, and VHD would not put the rescission of sale in writing. (FAC ¶ 23 & FAC ¶¶ 29-32 & FAC ¶¶ 33-34.) The summary also leaves out the general factual allegations that VHD ignored Plaintiff's three negative public reviews; ignored Plaintiff's second chance to address each point on Plaintiff's complaint with the Oregon DOJ; and the general factual allegations that VHD ignored Plaintiff's affidavit and subsequent Notice of Intent to Sue. (FAC ¶¶ 49, 50 & FAC ¶¶ 54-56.) In short, this is not a "summary of allegations"–it's a reenactment of VHD's history of evading accountability.

**"III.    ARGUMENT"**

**"B.    Green Fails to State a Claim for Breach of Contract"**

Defendant states "First, Green does not allege what the terms of the alleged contract between him and VHD were." However, the FAC pp. 9-10 Section V 'Count One – Breach of Contract' part A, ¶¶ 67-82 alleges a detailed account of the agreement between VHD and Plaintiff.

Defendant continues: "Instead, he vaguely tells the story of trying to buy a motorcycle from VHD, the deal falling through after Green submitted a finance application with 'without prejudice' next to his signature, and his finance application being denied." The chronology and logic of this statement is difficult to follow–what, exactly, does VHD *think* happened?

There's a difference between denying credit and refusing to run a credit check at all. Once The Bank actually ran Plaintiff's credit, it was approved (albeit, with a little help from Karl's magic). When Mike spoke to The Bank to ask about using a paper contract, the question wasn't whether Plaintiff's credit was approved or if The Bank would accept the terms Karl and Plaintiff agreed to–it was simply whether The Bank will accept a printout of the identical contract The Bank would definitely accept if signed digitally. VHD doesn't sign a bill of sale or facilitate the contract signing without knowing who will finance the purchase under the exact terms VHD and the customer agreed upon, so the concept of "the deal falling through" is not a possibility.

As to Defendant's story of Plaintiff's application with "without prejudice": Defendant fails to mention the contract–a separate document from the credit application.

Defendant continues on p. 7, "Green admits that VHD disclosed that any sale was contingent on Green securing financing, and Green admits that he did not secure financing. (*See, e.g.*, FAC ¶¶ 19, 20

& FAC ¶ 38 (alleging that VHD told Plaintiff 'the financing hasn't gone through and there is no sale.')"
This statement is unsubstantiated and misleading–

(a) Plaintiff denies "that he did not secure financing" or that he failed to meet any condition
precedent to the sale.

(b) VHD's after-the-fact justification that "the financing didn't go through"–a spot delivery
expression, when the transaction was never a spot delivery to begin with–does not constitute
"disclosure" that the sale was contingent on a condition that does not exist and was never
mentioned at the time of signing.

(c) Defendant's citation to FAC ¶¶ 19, 20 (which allege that VHD promised Plaintiff's motorcycle
would be paid off in one week and Plaintiff will own his bike free and clear) does not support
any assertion for which it is cited. If anything, FAC ¶¶ 19, 20 *supports Plaintiff's* breach of
contract claim. (See FAC ¶¶ 72-73 & ¶ 76.)

Defendant repeats the false assertion that Plaintiff alleges he failed to secure financing, and
Defendant contends that this false assertion demonstrates Plaintiff "failed to perform the terms of any
sale contract between him and VHD." "Because Green admits he failed to perform a core requirement
of any buyer in an alleged sales contract—paying the seller—his breach of contract claim fails."[6]
However, the agreement was that Plaintiff pay VHD $500 and The Bank pay VHD the remaining costs
and fees as itemized in the contract. VHD is estopped from denying that Plaintiff provided something
of value, when VHD coordinated the deal and routinely arranges the same terms with other buyers.
Plaintiff provided no less consideration than any other VHD customer financing through The Bank.

---

6. According to this logic, no VHD customer who finances a bike ever performs their core requirement.

Defendant states, "Green acknowledges that his securing of financing was a condition precedent to any alleged sales contract, (*see, e.g.*, FAC ¶¶ 19, 20 & 69)…" At this point, it is imperative to clarify what is meant by "financing," as "condition precedent," "sales contract," and to "secure" financing.

(a) If by "financing" Defendant means that the funds arrived in VHD's account, then this would be incorrect, and such definition is not reflected in ORS 646A.090. However, if by "financing" Defendant means The Bank agreed to pay VHD, this is both accurate and entirely consistent with how VHD structures all its financed sales.

(b) If by "condition precedent" Defendant means VHD would never sign a bill of sale, facilitate a customer's signing a promissory note and security agreement ("contract"), or allow a customer to take possession of a motorcycle unless The Bank had already agreed to pay VHD (i.e., "financing"), that is also correct. The Bank approved Plaintiff's credit and agreed to the financing terms prior to VHD and Plaintiff signing the sales documents and VHD confirming that Plaintiff could take his motorcycle.

(c) If by "sales contract" Defendant is referring to the bill of sale–signed by both VHD and Plaintiff, with no indication that the sale was contingent on any unmet conditions–then that too is correct. The Dealer Signature confirms that all precedent conditions to the sale were satisfied.

(d) If by "secure financing" Defendant means Plaintiff's credit was approved and The Bank agreed pay VHD as stipulated in the contract, then Plaintiff agrees: financing was secured at the time of signing all sales documents.

Additionally, Defendant's citation to FAC ¶¶ 19, 20 & 69 does not support Defendant's implication that financing was an unmet condition at the time of signing the sales documents–

(a) ¶ 19 essentially alleges that VHD promised Plaintiff a free motorcycle. This does not support

any inference that the sale was conditional or pending.

(b) More specifically, ¶ 19 alleges that VHD told Plaintiff, "We spoke to the bank. The bike will be

paid off in one week, they'll remove the lien, and the bike is yours," and ¶ 20 alleges Plaintiff

would have title. These paragraphs cannot be cited to support the claim that the financing

wasn't secured. A lien must first exist in order for it be removed. A creditor cannot place a lien

without an underlying security agreement–and the contract is literally the security agreement.

(Ex. 2.) Therefore, VHD's statement that The Bank would remove the lien acknowledges that

financing was, in fact, secured.

(c) ¶ 69 alleges that VHD held Plaintiff's motorcycle until The Bank received Plaintiff's contract in

the mail.[7] That is the *opposite* of a spot delivery, and it demonstrates that when VHD confirmed

Plaintiff could take his bike, all pre-sale conditions had already been met.

Then Defendant argues that the physical location of Plaintiff's property is relevant to the breach

of contract claim, and apparently conflates the concept of ownership and possession. Plaintiff is the

lawful owner, as evidenced by the picture of transfer of ownership (Ex. 6) and the bill of sale signed by

both parties, which lists Eaglemark Savings Bank as the lienholder and makes no indication that the

sale was contingent on any conditions. (Ex. 1.)[8]

---

7. Under the mailbox rule, Plaintiff's acceptance of The Bank's offer to contract became effective the
moment it was dropped in the mail–and arguably even before that, when Plaintiff irrevocably handed it
to Mike, the finance guy at VHD. The Bank's instruction for VHD to hold Plaintiff's bike until The
Bank received the contract in the mail was a post-approval procedure, not an indication that the sale
was pending.

8. *Bill of Sale*, Wex, Legal Info. Inst., Cornell L. Sch.,
https://www.law.cornell.edu/wex/bill_of_sale (last visited Sep. 2, 2025) ("A bill of sale is a written
instrument that attests to a buyer's purchase of property from a seller. In this way, it is similar to a
receipt.... *buyers lacking physical possession may use a bill of sale as proof of their ownership rights*.")
(emphasis added).

Page 8 reintroduces ORS § 646A.090, paraphrasing the context for the statute (i.e., a transaction commonly known as a "spot delivery") while directly quoting the customer's requirement under subsection (4) to return everything. However:

(a) The exact wording in ORS § 646A.090(4) is: "and a lender does not agree to purchase the retail installment contract…"–not, "and a lender agrees to pay the dealer but subsequently violates that agreement by refusing to pay the dealer as agreed."

(b) Just because ORS § 646A.090 permits a dealer to execute spot deliveries does not, in any way, prove that this particular transaction ever qualified as one.

Defendant further asserts: "This statute gave VHD the absolute right to cancel the transaction when Green failed to secure financing." However, the contract and bill of sale reflect that financing was secured at the time–just as it is with every other VHD customer. The Bank's decision to back out of the deal does not retroactively change the nature of the original sale or grant VHD any new statutory rights. Defendant's argument effectively shifts the burden of resolving VHD's dispute with The Bank onto Plaintiff, which is not supported by the agreement or the law.

Defendant continues, "It does not matter whether or not Green was 'aware' of this because it is the law and it governed this transaction." However, Plaintiff is not claiming ignorance of the law–he is alleging that, if VHD intended for it to be a spot delivery, then VHD had a duty to disclose that at the time of the sale. (FAC ¶ 79.) While ORS § 646A.090 may shield VHD from a conversion claim–had the sale been a spot delivery–it would not shield VHD from liability for breach of contract, since VHD did not disclose or reserve any right to cancel after delivery. A party cannot take refuge in statutes when it deliberately omits material terms from the contract.

Defendant's next statement, "VHD cannot be liable for breach of contract for doing what it was statutorily entitled to do in not turning over the motorcycle to Green when his finance application was denied," hinges on the false premise that Plaintiff's finance application was denied. Since Plaintiff's application was approved (FAC ¶ 9), this defense has no merit. As to Defendant's footnote 6–that "Green never alleges that he offered to pay cash for the motorcycle, and therefore his securing financing was, as he admits, a condition precedent for any sale contract"–the validity of that claim depends on what is meant by "securing financing," "condition precedent," and "sales contract." (See page 10 of this response for definitions of these terms.)

"Finally, Green's breach of contract claim fails because he does not allege that he suffered any damages." However, this assertion overlooks the damages Plaintiff clearly alleges: "Plaintiff was deprived of his property due to VHD's breach of contract." (FAC ¶ 82.)

### "C.    Green Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing"

Defendant's defense is that Plaintiff has not "even alleged enough facts to establish that there was a contract" and: "If no contract exists, the duty of good faith and fair dealing is not implicated." (p. 9 Def. Mot. to Dismiss.) However, the bill of sale–signed by Plaintiff and VHD–is evidence of a contract between Plaintiff and VHD, whether that underlying contract was created by VHD's words, actions and intent.[9] VHD clearly intended that the sale was binding: the bill of sale shows The Bank as lienholder, which indicates The Bank agreed to finance the sale; the contract shows The Bank as the lender and lists the amount it will pay VHD; Vicki took a picture of Plaintiff on the motorcycle as proof of transfer of ownership; Travis confirmed Plaintiff could take his motorcycle; Joe promised Plaintiff a free motorcycle in Plaintiff's name; VHD's service department kept Plaintiff abreast of the status of

---

9. *Restatement (Second) of Contracts* § 4 (1981) ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.")

parts and estimated time they'd finish working on his motorcycle; Plaintiff received a Harley-Davidson welcome letter and HOG membership card; Vicki reassured Plaintiff it was a done deal; Mike tried registering Plaintiff's motorcycle; Mike was stressed and frustrated about The Bank's refusal to pay, yet never so much as hinted that Plaintiff may need to return his motorcycle–until it happened to come up in conversation during a chance encounter that VHD had the bike and Mike suddenly decided mid-conversation that Plaintiff can't have his motorcycle–and even after that conversation, Mike waited nearly two weeks to tell VHD's service department.

And Defendant asserts elsewhere that VHD allegedly had the right to retake Plaintiff's motorcycle because that was allegedly part of the agreement. So, clearly, Defendant acknowledges that (a) an agreement existed, and (b) Plaintiff is deprived of that motorcycle. So, while Defendant may disagree with Plaintiff's allegations that the act was wrongful, Defendant cannot deny that there was a contract to breach or that–if that contract were breached–Plaintiff suffered damages as a result.

The contract between VHD and Plaintiff was that Plaintiff pay $500 down, sign all the paperwork, and provide OREGON ID and proof of insurance. All of which Plaintiff performed. In exchange, VHD would give Plaintiff a motorcycle, swap the red tin out for a black one, and do some other modifications when the parts arrived. [Plaintiff signed a document regarding the down payment and modifications, but Plaintiff did not receive his copy. Plaintiff later asked Mike for a copy but Mike refused.] Plaintiff's waiver of rights was never a condition precedent to the sale, therefore refusal to waive any rights after the sale is not a valid justification for VHD to deny having ever sold Plaintiff a bike.

The breach is that VHD did not do the tin swap–or any other promised modifications–and VHD denied having ever sold Plaintiff a motorcycle. The damage is that Plaintiff no longer had access to his property. And the time and energy invested and disappointment. The refund was issued unilaterally, and

Plaintiff was not even aware that it would be issued or *that* it was issued until he happened to see it when his credit card statement arrived. This constitutes a breach of the terms because the intent was that the sale was irrevocable, and Plaintiff never consented to the change in terms (i.e., refund, no possession of bike).

A secondary agreement and breach is that Joe promised Plaintiff the bike would be paid off in a week and Plaintiff would own it free and clear. Although Plaintiff is still the lawful owner, and his perfected lien is still in effect, it does him no good if he cannot use, sell, or enjoy his property.

Having established that (a) an agreement, promise or contract existed, and that (b) Plaintiff performed as agreed, it follows that (c) an implied covenant of good faith and fair dealing existed between VHD and Plaintiff.

Thus, even if VHD were exercising a legitimate right, that would not negate the duty to unwind the deal in a fair, honest, and respectful manner.

The FAC Count Nine includes "Lack of Full Disclosure" in its "Breach of Good Faith" claim because the pre-sale and sales process experience created a consistent pattern of deception, coercion, and manipulation that poisoned the relationship from the start, intensifying the emotional impact of all subsequent interactions. Count Nine also includes Plaintiff's interactions with VHD employees when he hand delivered his NOI to Sue, because it illustrates VHD's ongoing evasion of any accountability and their disregard for Plaintiff as a living being, both of which violate the implied covenant of good faith and fair dealing.

Defendant closes this defense with: "While Green alleges that he is entitled to ten million dollars from VHD, this allegation is not plausible as he does not explain where this number comes

from, and it is obviously fantastical given that the case revolves around his attempt to buy a motorcycle for approximately $21,000. (FAC Ex. 1.)""[10] Plaintiff responds–

(a) The $10M comes from Plaintiff's unrebutted affidavits which stand as truth in commerce, and Plaintiff's hand delivered NOI to Sue for $10M if VHD does not offer a settlement within the specified amount of time. Had VHD thought the amount "fantastical" at the time, they could have contested it then, responded to Plaintiff's affidavit, or offered some other mutually amicable arrangement. However, VHD simply ignored Plaintiff's NOI, thereby acquiescing to be sued for $10M.

(b) "Coercing Plaintiff into waiving his rights in exchange for a motorcycle constitutes a form of abuse. The damage goes beyond the mere loss of the motorcycle and the time and energy invested; it represents a significant attack on Plaintiff's dignity, resulting in an acute awareness of being exploited and dehumanized." (FAC ¶ 132.)

(c) Ultimately, the amount awarded is up to the jury. And in the interim, it would be unjust to dismiss Plaintiff's breach of the implied covenant of good faith and fair dealing claim on the sole basis that Defendant contests the sum demanded.

**"D.    Green Fails to State a Claim for Conversion"**

Defendant states, "Green fails to state a claim for conversion because he cannot plausibly allege that he owned the motorcycle that is the subject of his conversion claim… Instead, he admits that the sale was contingent on his securing of financing, and that he never did secure that financing. (FAC ¶¶ 19–20 & 38.)" Defendant repeatedly cites to those paragraphs, but they do not support Defendant's defense, regardless of the context in which they are cited to:

---

10. As to Defendant's footnote 7, which raises irrelevant demands for relief in an irrelevant case against irrelevant defendants: those demands are based on Plaintiff's fee schedule and invoice, and the defendants' failure to rebut Plaintiff's affidavits.

(a) FAC ¶ 19 alleges that Joe at VHD told Plaintiff, "The bike will be paid off in one week, [the bank] will remove the lien, and the bike is yours." In other words, VHD promised Plaintiff a free motorcycle. FAC ¶ 20 alleges "[Vicki] and Joe discussed the anticipated timeframe for The Bank to release the lien and for Plaintiff to receive the title." In other words, the title would reflect that Plaintiff owned the motorcycle free and clear ("clear title").

At the time of this conversation (June 6th), Plaintiff was already the lawful owner (see bill of sale, Ex. 1), The Bank had already agreed to finance the purchase (see contract, Ex. 2), VHD had already transferred ownership of property (see proof of delivery, Ex. 6), and VHD had already confirmed Plaintiff could take possession of that property (FAC ¶ 18). The discussion regarding anticipation of lien release and title issuance reflects that Plaintiff would receive unencumbered title to property he already owned–and that this would happen way earlier than originally expected.

Even though Defendant repeatedly cites to these paragraphs, Defendant fails to articulate any relevance between (A) VHD's promise that Plaintiff would soon own the bike free and clear and the discussion of expedited loan discharge and title issuance, and (B) Defendant's argument that the sale was still pending, that Plaintiff's application was denied–or any other argument that cites to FAC ¶¶ 19–20.

(b) As to FAC ¶ 38 ("Charlie told Plaintiff that Mike had instructed them the day before to hold off working on Plaintiff's motorcycle because 'the financing hasn't gone through and there is no sale.'): As an initial matter, the prior day was June 28th–twenty-three days after the sale, and thirteen days after Mike first discovered VHD had Plaintiff's motorcycle on June 15th. (FAC ¶¶ 27, 31-32.) This significant lapse between Mike's initial discovery and telling Charlie that "there is no sale" suggests that Mike was not relying on any legitimate dealer's right to rescind–

Page 17 – PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

rather, it suggests that Mike may have been waiting for Plaintiff to sign a new contract. [Indeed, at some point between Mike telling Plaintiff that he can't have his motorcycle and instructing Charlie to "hold off," Plaintiff received a call from saleswoman Vicki encouraging him to sign a new contract, saying: "Your bike is still upstairs, it has your name on it–you just need to sign a new contract, you don't need another application."]

Second, the FAC quotes the statement "the financing hasn't gone through" to illustrate VHD's false pretense–not to endorse VHD's narrative. The FAC alleges that The Bank agreed to finance the motorcycle but then refused to perform unless Plaintiff waived his rights. Plaintiff assumed that the disparity between that statement and the remaining 200+ paragraphs made the misrepresentation self-evident.

Defendant's final defense is that, even if Plaintiff had gained lawful ownership, "VHD could lawfully retake the motorcycle under ORS 646A.090(4). That statute provides that when a sale of a vehicle is contingent on a lender financing it, and the lender does not ultimately agree to finance the sale—which Green alleges is what happened here—the buyer (here, Green) must return the vehicle to the dealership. ORS 646A.090(2) & (4)." However, Defendant's paraphrase of ORS 646A.090(4) does not take the statute's context or definitions into account. That statute does not actually mean "and the lender does not ultimately agree to finance the sale." Rather, it uses the precise wording "and a lender does not agree to purchase the retail installment contract," and "final approval of funding."

"Final approval of funding" means a lender's irrevocable agreement to purchase a retail installment contract or lease agreement from a seller according to the exact terms that the seller and buyer have negotiated. (ORS 646.090(1)(b).)

This clearly pertains to a spot delivery, where the dealer drafts the retail installment contract and hopes that a third party will purchase the retail installment contract. However, The Bank drafted the

contract–not VHD. It makes no sense for The Bank to (a) draft contract terms it doesn't agree to or (b) "purchase" the contract from itself. And if Defendant wants to claim that TMCRC ("VHD") drafted the contract, they would need to cite Nevada statute, not Oregon statute, because the contract states:

> "22. Applicable Law. This Contract has been submitted for acceptance and is deemed to have been executed in Carson City, Nevada." (contract, p. 4.)

> Furthermore, the contract states:

> "Lender may be required by state or federal law to change the terms and conditions of this Contract, and You agree to be bound by any document provided by Lender that implements those changes. Any change in terms of this Contract must be in writing and signed by Lender. No oral changes are binding." (p. 4 para. 19.)

So even if VHD had drafted the contract (which would raise an entirely different set of legal issues)[11] this clause constitutes an "irrevocable agreement" to the "exact terms that the seller and buyer have negotiated." Also, it is important to note that "final approval of funding" is not defined as "the funds arriving in the dealer's account." A lender's failure to perform under an agreement does not activate a dealer's right to invoke ORS 646A.090.

For these reasons, ORS 646A.090 does not apply to the transaction in question. And it certainly doesn't apply when Defendant's next sentence ties the statute to "after Green's finance application was denied…," despite the FAC clearly alleging that financing was approved.

---

11. Had VHD issued the retail installment contract with the intention of selling it to a third party lender, ORS 83.890 would require the following notice to be printed in at least 8-point type on the same side of the page as the customer's signature (here, p. 2 of the contract): "NOTICE: The seller intends to sell this contract to (insert name and mailing address of holder) which, if it buys the contract, will become the owner of the contract and your creditor. After the sale of this contract, all questions concerning either terms of the contract or payments should be directed to the buyer of the contract at the address indicated above."

Because Defendant's argument is based on false premises and an inapplicable statute, and cites to paragraphs in the FAC which do not support that argument, there is no basis for dismissal of conversion claim prior to Defendant answering the FAC.

"**E.     Green Fails to State a Claim for Fraud**"

Defendant argues that Karl at VHD's intentional removal of "without prejudice" on Plaintiff's credit application doesn't constitute fraud because, "this is an alleged action, not a representation." (Def. Mot. to Dismiss at 11.) If Defendant means to say that this action may satisfy an element of common law fraud but not "fraud," that has already been subtly addressed by Hon. Michael Simon, who, in his Order dated January 23, 2025, expressly allowed "Plaintiff's claim for *common law fraud* against Defendant Volcano Harley-Davidson" to proceed. (Order at 3, ECF No. 10.) (emphasis added.)

Next, Defendant conflates the credit application with the financing contract–referring to them interchangeably–and states that "other allegations from Green contradict this allegation." Any such contradictions, however, exist only in Defendant's mischaracterization of Plaintiff's allegations–not in the allegations themselves.

As to Defendant's seeming confusion regarding FAC ¶ 121 ("Karl's deception became evident when The Bank subsequently rejected Plaintiff's contract because it included 'without prejudice'.")– The application and contract are two separate documents. Customers fill out the application at a table on the sales floor and Karl handles the application at his desk also on the sales floor. After Karl and the customer agree on the financing terms, the customer goes to Mike's office in the back, where Mike goes over the contract and the customer signs it. Two different documents signed at two different times at two somewhat different locations with two different VHD employees with two different positions.

"Karls' deception" refers to the omission of "without prejudice" on the June 3 credit application. Karl initially told Plaintiff that The Bank won't accept "without prejudice" and asked Plaintiff to cross it out. Plaintiff refused, so Karl omitted the phrase from the application and submitted it anyway. That's how the application ended up getting approved. Plaintiff was not aware that Karl had omitted it and that The Bank hadn't actually accepted Plaintiff's use of "without prejudice", until six day later when business manager Mike informed Plaintiff that The Bank was withholding payment until Plaintiff either signs a new contract or provides the basis for "without prejudice." (FAC ¶ 21.) [Plaintiff was perplexed as to why The Bank was acting they hadn't seen "without prejudice" before, when they already accepted it on his application. So Mike explained that Karl left it out on the application, so the contract was the first time The Bank saw "without prejudice."]

The "actionable misrepresentation" is twofold:

1. Karl knew that Plaintiff's agreement to submit the credit application was contingent on its inclusion of "without prejudice." Plaintiff trusted that Karl would not submit the application unless it included "without prejudice." Karl had a duty to tell Plaintiff *before* he submitted it if he could not or would not include "without prejudice," so Plaintiff could make an informed decision whether to proceed. Nevertheless, Karl omitted that phrase and submitted the application anyway.

2. When Karl returned a few minutes later and told Plaintiff, "It's all good, you were approved for [x] amount," Karl further misrepresented the situation by failing to inform Plaintiff of the omission. This gave Plaintiff that false impression that The Bank accepted Plaintiff's reservation of rights.

Defendant states, "[Plaintiff] does not, and cannot, allege that anything VHD told him induced him to include this language in his finance application." (Def. Mot. to Dismiss at 12.) Plaintiff agrees–

Page 21 – PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

he does not allege that VHD induced him to reserve his rights on the finance application. Rather, Plaintiff alleges that VHD induced him to get a credit check he would not have agreed to otherwise.[12]

In the following paragraph, Defendant talks about the credit application but cites to FAC ¶¶ 91–93, 97, which explicitly refer to the *contract*–not the credit application. For example, FAC ¶ 91 states, "VHD scanned and mailed Plaintiff's contract, as agreed, and held Plaintiff's motorcycle until the agreed upon date." Notably, the paragraphs Defendant cites are just a few lines from ¶ 86, which explicitly distinguishes between Plaintiff's inclusion of "without prejudice" on the application and his use of it on the contract: "The credit application and the promissory note were distinct transactions—Plaintiff could have neglected to reserve his rights on the credit application while still reserving them on the promissory note, or vice versa."

Defendant concludes this section with: "[Plaintiff] cannot blame VHD for his choice to include 'without prejudice' with his signature or claim that VHD is the cause of any stress or aggravation he may have suffered because of his own choices. Green's fraud claim fails because he does not allege with particularity how any misrepresentation of VHD caused him damages." However, Defendant has already acknowledged that Plaintiff does *not* allege that VHD "induced him to include this language in his finance application." (Def. Mot. to Dismiss at 12.) This statement defends against an allegation that Defendant has already acknowledged does not exist.

### "F.    The Court Should not Grant Green Leave to Amend"

Defendant reiterates its conclusion to Section 1 – Introduction, and further concludes that leave to amend would be futile. Plaintiff reiterates his response–

_____

12. Additionally, the entire application was fraudulent from the outset because, had Plaintiff known the motorcycle wasn't even for sale, he would not have even filled out the application in the first place. This fraud within a fraud reflects a pattern and is not to be taken lightly.

*No set of facts consistent with VHD's incorrect, misleading and unsupported representation of Plaintiff's First Amended Complaint could give rise to a cognizable claim against VHD.*

And, in a sense, Plaintiff agrees–if Defendant is unable or unwilling to acknowledge and address the factual allegations in the current Complaint, then amending an already well-pleaded Complaint would indeed be futile. However, should this Honorable Court grant leave to amend, Plaintiff respectfully renews his request for permission to add a separate claim for fraud because Defendant induced Plaintiff twice to apply for a motorcycle not intended for sale–their active participation in the application process goes beyond a mere Oregon UTPA violation for false advertising, and Plaintiff's initial request was within Oregon's statute of limitation.

## IV.    CONCLUSION

Defendant's defense hinges on denial of material factual allegations, uses strawman arguments, and conflates distinct factual allegations. Defendant has evaded accountability for far too long, and should be ordered to answer the First Amended Complaint point by point.


Dated September 5, 2025                              RESPECTFULLY SUBMITTED,

                                                    GAVRIEL GREEN®

                                                    By: /s/ *Gavriel Green*